FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 2 4 2014 ★

BROOKLYN OFFICE



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

CHIN CHONG,
                Defendant.

**STATEMENT OF REASONS
FOR SENTENCING**

13-CR-570

**Appearances:**

United States of America:

Nadia Moore
U.S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6362

Chin Chong:

Chase Scolnick
Federal Defenders of New York, Inc.,
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1213

**JACK B. WEINSTEIN, Senior United States District Judge:**

### Table of Contents

I. Introduction: Sentencing Non-Citizens Guilty of Serious Felonies ................................... 2

II. Context ............................................................................................................................ 4

    A. Prison Overcrowding ................................................................................................ 4

    B. Deportation ............................................................................................................... 5

III. Law ............................................................................................................................... 6

    A. Effect of Deportation on Sentencing ....................................................................... 6

    B. Section 3553(a)(2) Factors ....................................................................................... 7

        1. Just Punishment ................................................................................................ 9

        2. Deterrence ....................................................................................................... 12

        3. Incapacitation .................................................................................................. 14

       4.    Rehabilitation........................................................................16

    C.  Sentence Disparities .............................................................18

IV.  Facts........................................................................................19

    A.  Defendant's Background .......................................................19

    B.  Offense Conduct..................................................................21

V.  Application of Law to Facts .........................................................23

    A.  Section 3553(a)(2) Factors .....................................................23

    B.  Sentence Disparities ............................................................25

VI.  Sentencing Guidelines ...............................................................26

    A.  Base Offense Level...............................................................26

    B.  Calculations ......................................................................28

VII.  Conclusion ...........................................................................29

## I.    Introduction: Sentencing Non-Citizens Guilty of Serious Felonies

This memorandum addresses the sentencing of a noncitizen with significant ties to the United States who has committed a serious felony. He has dealt in methylone, a dangerous "recreational drug." *See* Mosi Secret, *Safer Electric Zoo Festival Brings Serious Beats and Tight Security*, N.Y. Times, Sept. 1, 2014, at A13 ("A rash of young people attending dance events around the country have died after showing symptoms consistent with overdoses from MDMA, methylone and other synthetic party drugs that are sold as Ecstasy or Molly.").

Under present national policy, such a defendant will almost certainly be removed from the United States after serving the incarceration portion of his sentence. Considering the grave hardships deportation entails, the nation's present deportation policy, and the core purposes of criminal sentencing, *see* 18 U.S.C. § 3553, imposition of minimal prison time, with prompt deportation should be normal in such cases—subject to variations for individual circumstances.

Chin Chong, the defendant, falls within a substantial class of noncitizens who are convicted of crimes defined as removable offenses. *See* 8 U.S.C. § 1227. He is a 29-year-old

lawful permanent resident with no prior criminal history, convicted of a single count for possession of a small amount of methylone (sometimes referred to as "Molly") with intent to distribute. Methylone was recently added to the list of Schedule I controlled substances. *See* Controlled Substances: Placement of Methylone Into Schedule I, 78 Fed. Reg. 21, 818 (Apr. 12, 2013); *United States v. Chin Chong*, 991 F. Supp. 2d 453, 456 (E.D.N.Y. 2014) (discussing "designer drug" prosecutions).

The defendant was caught trying to obtain through the mails a substantial quantity of the drug from a laboratory in China. It was imported for sale to his small circle of friends.

Since the age of twelve, Chong has lawfully lived in New York City. He remains a Malaysian citizen.

Until recently, district judges in this circuit were prohibited from considering the harsh consequences of deportation when imposing a term of incarceration. *Compare United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014) ("[A] district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family,") *with United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007) ("[T]he district court erred as a matter of law in factoring into [defendant]'s sentence his likely deportation after serving his prison term."). Other courts of appeals have expressed the view that the likely prospect of deportation must be ignored at sentencing. *See infra* Part III. A.

Application of routine sentencing principles should lead district courts to account for the prospect of deportation when considering imposition of a term of incarceration. For district judges who face real persons—judges who are duty-bound to act "in a field of pain and death," Robert M. Cover, *Violence and the Word*, 95 Yale L.J. 1601, 1609 (1986)—sensitivity to the reactions of the individuals subject to our criminal justice system ensures that sentences are

"sufficient, but not greater than necessary." 18 U.S.C. § 3553(a); *cf.* Primo Levi, *The Drowned and the Saved* 141 (1989) ("But above all . . . I contracted . . . the habit of never remaining indifferent to the individuals that chance brings before me.").

## II.     Context

### A. Prison Overcrowding

Criminal sentencing is predicated on an "individualized assessment" of each defendant. *Gall v. United States*, 552 U.S. 38, 50 (2007). The question whether sentencing judges should consider—and how much weight they should give to—the prospect of deportation of the persons before them implicates broad legal, political, and social controversies. *See generally* Peter H. Schuck, *Immigrant Criminals in Overcrowded Prisons: Rethinking an Anachronistic Policy*, 27 Geo. Immigr. L.J. 597 (2013) (urging the early release and removal of many deportable immigrant criminals). A review of recent developments provides context for the case at hand.

The rapid growth of the American prison population has, in addition to destroying lives and communities unnecessarily, put significant strain on taxpayers and those tasked with warehousing the convicted. The situation has become so grave that the Supreme Court recently affirmed "what is perhaps the most radical injunction issued by a court in our Nation's history: an order requiring California to release the staggering number of 46,000 convicted criminals." *Brown v. Plata*, 131 S. Ct. 1910, 1950 (2011) (Scalia, J., dissenting); *see also id.* at 1928 (majority opinion) ("A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."). The public safety benefits attributable to this vast carceral project are dubious. *See, e.g.*, Franklin E. Zimring, *The City that Became Safe: New York's Lessons for Urban Crime and Its Control* 165 (2011) ("The limited data available make it quite clear that both the timing and

magnitude of the decline in serious crimes in [New York City] could not be accounted for by outmigration or incapacitation.").

## B. Deportation

Debates over immigration continue to confound national policymakers. The recent arrival of thousands of unaccompanied minors at the United States' southern border is but the latest chapter of this ongoing saga. *See* Michael D. Shear & Jeremy W. Peters, *Obama Asks for $3.7 Billion to Aid Border*, N.Y. Times, July 9, 2014, at A1; Barry Moreno, *Children of Ellis Island* (2005) (discussing arrival of immigrant children, including unaccompanied minors, at Ellis Island). While "[i]mmigrants are less likely than American citizens to be convicted of crimes committed in the United States," the "number of immigrants in American prisons and jails is very significant." Schuck, *Immigrant Criminals*, 27 Geo. Immigr. L.J., *supra*, at 597.

Since the mid-1980s, the federal government has increasingly embraced a national policy of deporting immigrants who commit crimes. *Id.* at 642–49. Congress has expanded the definition of "aggravated felony," lowered the sentencing threshold required to make specific crimes the basis for deportation, subjected many immigrant criminals to summary deportation, and foreclosed most forms of discretionary relief. *Id.* at 644–45. The Executive Branch has been proactive, as well, seeking deportation of many individuals convicted of serious as well as minor crimes. Ginger Thompson & Sarah Cohen, *More Deportations Follow Minor Crimes, Data Shows*, N.Y. Times, Apr. 7, 2014, at A1 ("[S]ince President Obama took office, two-thirds of the nearly two million deportation cases involve people who had committed minor infractions, including traffic violations, or had no criminal record at all. Twenty percent—or about 394,000—of the cases involved people convicted of serious crimes, including drug-related offenses . . . .").

The practice of increasing deportations as a result of criminal convictions represents a "dramatic[]" change in the landscape of federal immigration law. As the Supreme Court recently explained:

> While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation. The "drastic measure" of deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes . . . . These changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction.

*Padilla v. Kentucky*, 559 U.S. 356, 360–64 (2010) (citations omitted).

## III. Law

### A. Effect of Deportation on Sentences

The Court of Appeals for the Second Circuit holds that when "determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties presented by the prospect of [deportation] proceedings and the impact deportation will have on the defendant and his family." *Thavaraja*, 740 F.3d at 262–63. In so doing, the court recognized that an earlier line of its cases prohibiting consideration of deportability was abrogated. *Id.*; *see United States v. Wills*, 476 F.3d 103 (2d Cir. 2007); *United States v. Restrepo*, 999 F.2d 640 (2d Cir. 1993); *cf. United States v. Castro-Rivas*, 254 F. App'x 742, 751 (10th Cir. 2007) (citing *Wills*, 476 F.3d at 109), *abrogated by United States v. Sanchez-Leon*, No. 13-1401, 2014 WL 4178302 (10th Cir. Aug. 25, 2014).

These earlier Second Circuit cases have been relied upon by other courts of appeals, some of which continue to reject the relevance of deportability at sentencing. *See United States v. Telles-Milton*, 347 F. App'x 522, 525 (11th Cir. 2009) ("[W]e are not aware of any case in which we have upheld a downward departure based upon collateral consequences related directly

or indirectly to the defendant's status as an alien.") (quotation marks and citations omitted); *United States v. Misquitta*, No. 13-3132, 2014 WL 2523783, at \*158 (3d Cir. June 5, 2014) ("multiple circuits have held that a district court is not permitted to consider [deportability].").

Other appellate courts have held or hinted that district judges may consider deportability, but that they are not required to do so. *See United States v. Salguero-Ortiz*, 483 F. App'x 858, 864 (4th Cir. 2012) ("While we have implicitly concluded that district courts have the discretion to impose below-guidelines sentences [based on the defendant's deportable status] . . . we have never suggested that district courts are required to do so . . . . Accordingly, the district court did not err by failing to raise this issue *sua sponte*.") (internal citations omitted); *United States v. Samayoa-Baltazar*, 436 F. App'x 620 (6th Cir. 2011) ("While we might prefer that the district court had explicitly addressed defendant's argument that his deportation represented punishment that warranted a variance, the context and the record make clear the court's reasoning."); *United States v. Molina*, 563 F.3d 676, 679 n.3 (8th Cir. 2009) ("This is not to say that the district court was precluded from considering the effects of [the defendant]'s eventual deportation in connection with the statutory sentencing factors, only that the court was not *required* to do so after [the defendant] failed to raise the issue at sentencing.") (emphasis in original); *United States v. Garay*, 235 F.3d 230, 233 n.18 (5th Cir. 2000) (recognizing abrogation of *United States v. Nnanna*, 7 F.3d 420 (5th Cir. 1993), and acknowledging "alienage and its attendant consequences" may provide basis for downward departure).

## B. Section 3553(a)(2) Factors

Discretion remains an indispensable mitigating safety valve for the law's sometimes destructive and illogical effects. *See United States v. C.R.*, 792 F. Supp. 2d 343 (E.D.N.Y. 2011) (holding mandatory minimum sentence unconstitutional), *rev'd*, 731 F.3d 204 (2d Cir. 2013);

*United States v. C.R.*, 972 F. Supp. 2d 457 (E.D.N.Y. 2013) ("The effect of harsh minimum sentences in cases such as [this] is, effectively, to destroy young lives unnecessarily. The ancient analog of our modern destruction of youngsters by cruel, unnecessarily destructive and self-defeating, long minimum prison sentences was physically sacrificing them to ancient gods for the supposed benefit of society.") (internal citations omitted).

A district judge now has "broad discretion" in imposing a sentence, *United States v. Booker*, 543 U.S. 220, 233 (2005), except where Congress has imposed a "mandatory minimum" for a particular offense. *See United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013); *see also United States v. McIntosh*, No. 11-cr-500, 2014 WL 3675113, at *6 (S.D.N.Y. July 23, 2014) ("By interpreting the mandatory minimum provision to prohibit a sentencing court's individualized assessment and to override the requirement of parsimony, the *Chavez* Court [549 F.3d 119 (2d Cir. 2008)] held that one section of the U.S. Code—Section 924(c)—overrides the clear requirement of another section—Section 3553(a) . . . . The Court therefore puts on blinders, as *Chavez* commands, to the next 57 years of [defendant]'s life when determining what sentence is appropriate[.]").

Federal law provides district judges with basic sentencing considerations: it instructs the district court to "impose a sentence sufficient, but not greater than necessary" to achieve the basic aims of sentencing, with sensitivity to the "history and characteristics of the defendant." 18 U.S.C. § 3553(a), (a)(1); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). Section 3553 points judges to the four traditional justifications of the criminal sentence—retribution, deterrence, incapacitation, and rehabilitation—with the command

that "each of the four stated purposes should be considered in imposing sentence in a particular case." Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing*, 3 Fed. Sent'g Rep. 326 (1991) (quoting S. Rep. 98-225 (98th Cong. 1st Sess. 1983)); *see also* 18 U.S.C. § 3553(a) (sentence must be "sufficient, but not greater than necessary" to comply with these purposes).

As explained below, Section 3553 should now be interpreted as requiring district courts to weigh the prospect of deportation, which is "an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants[,]" when imposing a sentence. *Padilla*, 559 U.S. at 364.

1. *Just Punishment*

Section 3553(a)(2)(A) provides that the sentencing court shall consider the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]"

*Deportation is punishment*, at least outside the "special heaven reserved for the theoreticians of the law [where one encounters] the many concepts of jurisprudence in their absolute purity, freed from all entangling alliances with human life." Felix Cohen, *Transcendental Nonsense and the Functional Approach*, 35 Colum. L. Rev. 809 (1935). "Every one knows that to be forcibly taken away from home and family and friends and business and property, and sent across the ocean to a distant land, is punishment[;] and that oftentimes most severe and cruel." *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893) (Brewer, J., dissenting); *cf.* Edward Everett Hale, *The Man without a Country*, Atlantic Monthly, Dec. 1863, at 665–680 ("Youngster, let that show you what it is to be without a family, without a home, and without a country. And if you are ever tempted to say a word or to do a thing that shall put a bar

between you and your family, your home, and your country, pray God in His mercy to take you that instant home to His own heaven.").

Inveighing against the Alien and Sedition Acts, James Madison commented:

> If the banishment of an alien from a country into which he has been invited, as the asylum most auspicious to his happiness — a country where he may have formed the most tender connexions, where he may have vested his entire property, and acquired property of the real and permanent, as well as the movable and temporary kind; where he enjoys under the laws a greater share of the blessings of personal security and personal liberty than he can elsewhere hope for[;] . . . if a banishment of this sort be not a punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied.

James Madison, *Letters and Other Writings of James Madison* 526 (Cornell University Library 2009) (1865).

More recently, the close link between the penalty of deportation and criminal punishment was at the heart of the Supreme Court's opinion in *Padilla*, 559 U.S. 356 (2010) (holding erroneous advice of counsel concerning immigration consequences of conviction may support a Sixth Amendment claim). The Court emphasized that deportation, although "civil in nature," is:

> nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it most difficult to divorce the penalty from the conviction in the deportation context. Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult.

*Padilla*, 559 U.S. at 365–66 (citations and quotation marks omitted); *accord Fong Haw Tan v. Pehlan*, 333 U.S. 6, 10 (1948) ("Deportation is a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty.") (internal citations omitted).

In imposing "just punishment" for a particular offense, a sentencing judge cannot ignore the additional penalties and hardships that will attach as a result of conviction. *See* Hugh LaFollette, *Collateral Consequences of Punishment: Civil Penalties Accompanying Formal Punishment*, 22 J. of Applied Phil. 241, 244–46 (2005) (discussing and critiquing on proportionality grounds retributivist justification of collateral consequences); Jeremy Travis, *Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* (Marc Mauer & Meda Chesney-Lind eds., 2002) (arguing collateral punishments "are clearly retributive and convey societal condemnation of antisocial behavior"). It does not matter whether conviction's consequences are categorized as "direct" or "collateral." *See Padilla*, 559 U.S. at 366 ("Deportation as a consequence of a criminal conviction is . . . uniquely difficult to classify as either a direct or a collateral consequence."). Deportation is experienced as, and popularly understood to be, a form of punishment. The law does not contend otherwise..

An excessively harsh meaning of "just punishment" cannot be discerned from the statute's text or the voluminous legislative history of the Comprehensive Crime Control Act of 1983. Rather, Congress endorsed a flexible approach:

> The first purpose listed . . . —essentially the "just deserts" concept—should be reflected clearly in all sentences . . . . *From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case* and should not differ substantially from the sentence given to another *similarly situated* defendant convicted of a similar offense under similar circumstances.

S. Rep. No. 98-225, at 74–75 (1983) (emphasis added). It is untenable to maintain that judges should impose a sentence that, "[f]rom the defendant's perspective," is not "unreasonably harsh under all the circumstances of the case," while ignoring circumstances that are likely to be the most important to the defendant in evaluating the punishment.

The United States Sentencing Commission's *Guidelines Manual* does not directly address deportation, but it is notable that it urges district courts to take account of civil collateral consequences when imposing punishment. Sensibly, the Commission recommends that a district court imposing "punitive" criminal fines take into account "any collateral consequences of conviction, including civil obligations arising from the defendant's conduct." United States Sentencing Commission, *Guidelines Manual*, § 5E1.2(d)(5) (Nov. 2013).

A court tasked with imposing a sentence that "provide[s] just punishment" is obliged to consider whether the defendant is likely to face deportation. This may require—as it does in the present case—a lesser term of imprisonment for noncitizen defendants than otherwise would be appropriate.

### 2. Deterrence

Apart from whether it may be considered "punishment" for purposes of Section 3553(a)(2)(A), the possibility of deportation is germane to the question whether the imposed sentence is "sufficient, but not greater than necessary . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a).

For criminal sanctions to "afford . . . deterrence," specific or general, at least three assumptions must be made: "[t]he potential offender must know of the rule; he must perceive the cost of violation as greater than the perceived benefit; and he must be able and willing to bring such knowledge to bear on his conduct decision at the time of the offense." Paul H. Robinson & John M. Darley, *The Role of Deterrence in the Formulation of Criminal Law Rules: At Its Worst When Doing Its Best*, 91 Geo. L.J. 949, 953 (2003).

Less severe criminal sanctions will suffice to provide "adequate deterrence" when the defendants face the double threat of incarceration *and* deportation as a result of their conduct.

The "bad man of the law" cares not a whit whether deportation is characterized as a direct or collateral consequence of his conduct, or whether the penalty is civil or criminal in nature; he "cares only for the material consequences [that his] knowledge enables him to predict." Oliver Wendell Holmes, Jr. *The Path of the Law*, 10 Harv. L. Rev. 457, 459 (1897). *Accord Padilla*, 559 U.S. at 366 ("[W]e find it 'most difficult' to divorce the penalty from the conviction in the deportation context. Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult.") (citation omitted). Deportation undeniably is a "material consequence" of criminal wrongdoing. Rational actors can be expected to conform their conduct to avoid such an unwelcome fate.

Potential offenders, it is recognized, lack perfect information concerning the penalties that will attach for their misconduct. Were it otherwise, the Court's holding in *Padilla* would be superfluous, since noncitizen defendants would not need competent immigration advice to tell them what they know during plea bargaining.

Some members of the general public, particularly citizens, might not appreciate the defendant-specific reasoning animating a more lenient sentence for a noncitizen offender. But this is a critique of *all* deterrence-based theories of punishment; it is a risk inherent whenever a sentence is tailored to the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

The broad insight upon which *Padilla* rests is pertinent: the prospect of deportation matters a great deal to individuals encountering the criminal justice system in the real world. 559 U.S. at 364 n.7 (noting "real-world examples" of situations in which deportation constitutes "the most important part" of the penalty imposed) *but see* Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from "Secure Communities"*, 57 J. of L. & Econ. (forthcoming Nov. 2014), available at

http://its.law.nyu.edu/faculty/profiles/representiveFiles/does_immigration_enforcement_reduce_ crime_082514_94242D7E-F712-063A-64352391880DABF8.pdf (finding no meaningful reduction in local crime rates as a result of "Secure Communities," a federal program to check immigration status of persons arrested).

In rejecting the relevance of deportability to deterrence considerations in (the now-repudiated) *United States v. Wills*, the Second Circuit's Court of Appeals explained:

> In addition, a sentencing scheme in which future deportation may lead to diminished sentences would weaken the deterrent effect of punishment. Some potential criminals may consider deportation preferable to imprisonment and would therefore not be as deterred from committing future crimes if they thought they would be deported rather than serve all or part of what should be their appropriate prison term.

476 F.3d at 108. That reasoning reflected a misreading of Section 3553. Judges are not charged with imposing the sentence that provides the *greatest* deterrence possible; rather, the sentence should be "sufficient, but not greater than necessary . . . to afford *adequate* deterrence." 18 U.S.C. § 3553(a) (emphasis added). In cases where, because of established community ties, the added hardship of deportation results in a more severe penalty, a downward adjustment to the term of incarceration is warranted.

The prospect of deportation is critical in assessing whether a particular punishment "afford[s] adequate deterrence to criminal conduct," both with respect to the individual defendant (specific deterrence) and to those who may learn of defendant's exile in the community at large (general deterrence). *Id.*

### 3. Incapacitation

Section 3553(a)(2)(C) requires that the sentence imposed be sufficient, but not greater than necessary, "to protect the public from further crimes of the defendant." This provision

reflects a third traditional justification of sentencing—incapacitation. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing*, 3 Fed. Sent'g Rep. 326, *supra* at 326.

For many types of offenses, deportation will provide an effective means of protecting the public from future wrongdoing by the defendant, obviating the need for a lengthy and costly term of incarceration. A drug courier who imports controlled substances via a commercial airliner will face considerable difficulties committing another similar United States offense following deportation. Absent a prompt unlawful reentry, *see* 8 U.S.C. § 1326, or a crime capable of being committed from abroad, *see, e.g.,* 8 U.S.C. § 2251(c), the American public is generally safe from those who have been deported.

Expedited deportation of convicted criminals may increase the risk of harm to the public in the receiving countries, at least during the limited window of time the defendant would otherwise be incarcerated in an American prison. Section 3553 does not expressly distinguish between the need to protect the "American public" and the need to protect the "foreign public." And there is a strong argument that American deportation policies have fueled violence and instability in foreign countries. *See generally* Robert J. Lopez, Rich Connell & Chris Kraul, *Gang Uses Deportation to Its Advantage to Flourish in U.S.*, L.A. Times, Oct. 30, 2005, at A1 (discussing growth of US-trained criminal gangs in Central America); Scott Johnson, *American-Born Gangs Helping Drive Immigrant Crisis at U.S. Border*, National Geographic (July 23, 2014), http://news.nationalgeographic.com/news/2014/07/140723-immigration-minors-honduras-gang-violence-central-america; *see also Mother of Exiles: Let the Kids In*, Jewish Currents, Autumn 2014, at 5 ("In El Salvador, two infamous gangs . . . have turned the entire country into a turf-war battlefield . . . . *And they were founded in Los Angeles.* It wasn't until the

late 1990s, when federal officials began deporting thousands of gang members, that they took root in the soil of El Salvador.") (emphasis in original).

There are at least two reasons why these serious concerns about effects on other foreign countries are ultimately minor in the sentencing calculus. First, in determining the scope of the word "public," the district court is guided by the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Small v. United States*, 544 U.S. 385, 388 (2005) (citation omitted) (construing phrase "convicted in any court" to exclude foreign courts for purposes of federal felon-in-possession statute). It is reasonable to assume that Congress was concerned solely with the well-being of the American public when it enacted Section 3553(a)(2)(C). Second, whether or not a term of incarceration is imposed, it remains the policy of the United States that individuals convicted of serious crimes—some of whom remain dangerous—be deported upon the completion of their incarceration. *See supra* Part II. Bilateral or international agreements, not individual sentencing decisions by judges, offer the appropriate approach to the inevitable difficulties abroad that deportation engenders.

The diminished need to "protect the American public from further crimes of the deported defendant" argues in favor of shorter terms of incarceration.

### 4. Rehabilitation

The sentencing court must consider the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Imprisonment generally is "not an appropriate means of promoting correction and rehabilitation" 18 U.S.C. § 3582(a); *see also* S. Rep. 98-225, at 76–77 (same); *Tapia v. United States*, 131 S. Ct. 2382, 2384 (2011) (same).

Rehabilitative concerns weigh especially strongly against a term of imprisonment where the defendant is subject to deportation upon completion of a sentence. Although the government argues otherwise, the Bureau of Prisons has effectively endorsed this position, opting to exclude from rehabilitation programs (*e.g.*, drug treatment, job training) many prisoners subject to Immigration and Customs Enforcement detainers. *See Gallegos-Hernandez v. United States*, 688 F.3d 190 (5th Cir. 2012) (rejecting argument that exclusion of deportable aliens from rehabilitative programs violates prisoner's equal-protection rights); *Adams v. Apker*, 148 F. App'x 93 (3rd Cir. 2005) (same); *McLean v. Crabtree*, 173 F.3d 1176 (9th Cir. 1999) (same). *See also* U.S. Gov't Accountability Office, GAO-08-6, Cost of Prisons: Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities, 5 (2007) ("According to BOP officials and private contractors . . . . [p]rograms that focus on preventing returns to prison are not required of private facilities [devoted to noncitizens] because criminal aliens are released for removal from the country and are not expected to return to U.S. communities or BOP custody."). Acting as a therapeutic aid for other countries through incarceration is not our national policy.

Though mindful of the Second Circuit Court of Appeals' recent holding that "the cost of incarceration to the government . . . is not a relevant sentencing factor under the applicable statutes," *United States v. Park*, No.13-4143-cr, 2014 WL 3289493, at *3 (2d Cir. July 9, 2014), the district court is bound to consider whether the expenditure of scarce resources will effectively promote an enumerated Section 3553 factor. A lengthy term of imprisonment in the United States at the expense of the American taxpayer is unlikely to advance the effective rehabilitation of a defendant, particularly when the individual is soon to be expelled from the national community. *See* Benjamin Levin, *Inmates for Rent, Sovereignty for Sale: The Global Prison*

*Market*, 23 S. Cal. Interdisc. L.J. 509, 532 (2014) ("If the law in a democratic society purports to represent a codification of popular values, norms, or aspirations, how is it appropriate for a different polity with potentially different values, norms, and aspirations to be responsible for enacting this socializing discipline, this ultimate ritual?").

### C. Sentence Disparities

Congress has emphasized "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

"The key word in discussing unwarranted sentence disparities is 'unwarranted.'" S. Rep. 98-225 at 161. The fact that the noncitizen defendant may receive a sentence less than the citizen defendant may seem counterintuitive, but, as explained above, the two are not similarly situated. To the contrary, noncitizens and citizens face radically different outcomes as a result of their convictions. Consistent with the Section 3553(a)(2) factors, disparate sentences often will be "warranted."

Consideration has been given to the suggestion by some that significant disparities already exist between the sentences imposed on citizens and noncitizens. Because the evidence remains inconclusive, the court does not rely on this valuable body of scholarship in reaching its conclusion in the instant case. *See* Michael T. Light, *The New Face of Legal Inequality: Noncitizens and the Long-Term Trends in Sentencing Disparities across U.S. District Courts, 1992-2009*, 48 Law & Soc'y Rev. 447 (2014) (arguing data shows a non-citizenship "penalty" at sentencing and discussing conflicting studies); Jawjeong Wu & Jill M. D'Angelo, *Unwarranted Disparity in Federal Sentencing: Noncitizen Crime as a Social/Group Threat*, 39 Crim. Just. Rev. 58 (2014) (arguing "judges in districts with a large noncitizen population impose longer

sentences on noncitizen offenders than those in districts with a small noncitizen population.");
Richard D. Hartley & Luisa F. Armendariz, *Border Justice Sentencing Federal Narcotics Offenders in Southwest Border Districts: A Focus on Citizenship Status*, 27 J. of Contemp. Crim. Just. 43, 46 (2011) ("Studies including citizenship status in analyses of sentencing decisions have been especially scarce. Little is known, therefore, about how a defendant's citizenship status may affect judicial decision-making practices."); Scott E. Wolfe, David C. Pyrooz, & Cassia C. Spohn, *Unraveling the Effect of Offender Citizenship Status on Federal Sentencing Outcomes,* 40 Soc. Sci. Res. 349, 360 (2011) ("Both resident-legal aliens and illegal aliens faced substantially higher odds of incarceration than citizens, but illegal aliens (not resident-legal aliens) received shorter sentences than citizens.").

## IV.     Facts

### A.  Defendant's Background

Chin Chong was born in 1984 in Malaysia. When he was "very young"—the record does not supply a precise date—defendant's parents emigrated to the United States seeking greater economic opportunity. Defendant and his younger sister were left behind in Malaysia under their grandfather's care.

In September 1996, nine days after his twelfth birthday, defendant and his sister were reunited with their parents in New York. He has since legally resided in New York City and currently enjoys "lawful permanent resident" status.

His sister and defendant report a difficult relationship with their father. The defendant's sister states that their father was "verbally abusive to [the] whole family," an "unbearable tyrant . . . who curses and says mean things." Presentence Investigation Report ("PSR") ¶ 36; *accord* Ex. A (Letter to court from [family friend]) to Def.'s Sentencing Mem., ECF No. 148 ("[H]is father's temper had always been not good, yelling at people every day . . . . [T]heir father, if he

was home, would yell at his son and daughter loudly and fiercely whenever he was in a bad mood. Sometimes, I would get scared just listening to it.").

A strained connection with his father took a significant personal toll. Defendant grew depressed as a result of the verbal abuse, "locking himself in his room and declining invitations to attend dinner with her and their mother." PSR ¶ 41; *accord* Ex. A (Letter to court from [family friend]) to Def.'s Sentencing Mem., ECF No. 148 ("Each time that he was yelled at by his father, he would immediately return to his room and would not come out.").

Both parents worked hard to support the family. Ex. C (Letter to court) to Def.'s Sentencing Mem., ECF No. 148; Ex. B (Letter to court) to Def.'s Sentencing Mem., ECF No. 148 ("My sister-in-law's entire life was spent doing two things: to take care of her sick husband, and to make a scant living to support her family with her meager wages, while neglecting the whole process of her son's life changes."). With their parents otherwise occupied, the defendant and his sister "grew up mainly through influence from [their] friends and [their] surrounding environment." Ex. C (Letter to court) to Def.'s Sentencing Mem., ECF No. 148.

Chong attended high school in Flushing, New York, but did not graduate. He reports that he "was not productive in high school," but that he obtained his GED diploma shortly after completing the 11th grade. PSR ¶¶ 43–44. He has also taken some classes at LaGuardia Community College in New York City, and he has obtained a degree in Culinary Arts from the Art Institute of New York City.

Defendant has been employed in a variety of low-wage jobs since his teenage years. He has worked in fast food restaurants, at a movie theater, as a security guard, and as a maintenance worker in a condominium building. For the two years prior to his arrest, he worked as a quality

assurance representative at a retailer, earning $12 per hour. He left that job approximately eight months before his arrest, explaining that his boss "treated [him] like a robot." PSR ¶ 48.

Prior to his September 2013 arrest, defendant had no recorded criminal history.

## B. Offense Conduct

From at least 2012 onward, the defendant regularly attended nightclubs and music festivals with a few friends. During these outings, they all regularly took "Molly"—a generic term for a category of drugs including methylone. Defendant regularly procured the drugs for the group in exchange for the price of admission to an event, bottled water inside the venue, or cash. There is no evidence that defendant regularly sold or distributed controlled substances to individuals outside his circle.

A series of group conversations on WhatsApp—an instant messaging application for smartphones—record defendant's casual illicit activity. A June 2013 exchange between defendant and his co-defendant is representative of the shorthand references to drugs, their effects and their distribution:

| | |
|---|---|
| CHONG: | What's going with Jorge |
| SINGH: | Gimmie a few |
| | Yea 2 for them |
| CHONG: | K |
| | Did you let them know its 20 [dollars] |
| SINGH: | Yea |
| | K |
| CHONG: | K |
| SINGH: | Not guna force him to do it but just incase he wants to |
| CHONG: | Which deep [asking Singh to distinguish between two mutual friends, both named "Deep"] |
| | His girl is coming |
| SINGH: | 1 [indicating "Deep1"] |
| | Oh |
| | He's not gonna roll [*i.e.*, take drugs] in front of his wife |
| | Farjanna coming shoab still does it lol |
| CHONG: | Let me tell the group too |
| | But its shoab lol |

| | |
|---|---|
| SINGH: | Yea tell em |
| | Hahaa |
| CHONG: | His girl know what e [MDMA] is |
| SINGH: | Lol |
| | Tru |
| | Lol |
| CHONG: | Ok I just ask the guy for another fire [strong "Molly"] |
| SINGH: | Haha nice |
| CHONG: | It's 5 total right |
| | Counting Jorge and his friend |
| | Non fire |
| SINGH: | Deep shoab puma |
| | Jorge gave |
| | Gabe* |
| | Yea 5 |
| | Me anish u taking fire? |
| | . . . |
| CHONG: | I'm not taking fire either…or |
| SINGH: | Gabriel bruno bro who was supposed to do returns |
| | Ohh so u take reg then |
| CHONG: | I don't [know] yet if I'm gonna roll |
| SINGH: | Comon son |
| | Do it |
| CHONG: | Dude its money lol |
| | . . . |
| SINGH: | Ill get u the fire…u get the water |
| CHONG: | -_- |
| SINGH: | So we good? Lol |
| CHONG: | Sigh |
| | I'm not gonna have extras |
| | Just letting you guys know that lol |

ECF No. 147-4 (Gov. Ex. 14-A); *see also* Trial Tr., 157:15–165:17, Mar. 28 2014 (summarizing conversation).

Defendant became more ambitious in his efforts to procure and distribute methylone in the summer of 2013. Finding wholesale quantities of methylone was not difficult: China-based laboratories advertising "legal highs" openly sold the drug via the internet and shipped to customers in the United States and Europe using regular international courier services or mail. *See generally* Charlie Campbell, *With Labs Pumping Out Legal Highs, China Is the New Front*

*in the Global Drug War*, Time (Sept. 2, 2013), http://world.time.com/2013/09/02/with-labs-pumping-out-legal-highs-china-is-the-new-front-in-the-global-drugs-war.

At some point in mid-August 2013, after successfully receiving a small "sample" shipment from China, defendant ordered approximately 500 grams of methylone. He enlisted his friend and former co-worker, Harpreet Singh, to receive the mail package at the friend's workplace. Defendant promised to pay Singh a few hundred dollars for receiving the package on his behalf.

The shipment did not arrive as planned. United States Customs and Border Protection officials at J.F.K. Airport intercepted the package, and after substituting brown sugar for the methylone, executed a controlled delivery to the friend's workplace.

Ten minutes after the delivery, federal agents entered the workplace and found the parcel on Singh's desk. Singh immediately confessed to his role in the importation scheme, was placed under arrest, and worked with law enforcement to complete the controlled delivery to defendant. Since defendant had caught word of Singh's arrest, these efforts were unsuccessful.

Chong was arrested on a public sidewalk later that afternoon. He carried incriminating evidence in the form of many empty capsules used in packaging retail components of Molly.

## V.    Application of Law to Facts

### A. Section 3553(a)(2) Factors

Critical to the determination of an appropriate sentence is the likelihood that defendant will be deported as a result of his conviction. As discussed *supra* Part III.B., this basic fact is relevant to each of the Section 3553(a)(2) factors.

Even without a lengthy term of incarceration, defendant will be adequately punished for his wrongdoing by his expulsion from the United States. He will be transported to a foreign

country, Malaysia, to which he has no meaningful connection. He will be separated from his younger sister and parents; from his friends; and from the only community he has known throughout his teenage and adult life. While English is widely spoken in Malaysia, defendant is no longer fluent in the local languages, skills that will be critical as he seeks to rebuild his life. *See* Jennifer Pak, *Is English or Mandarin the language of the future?* BBC News Magazine (Feb. 12, 2012), http://www.bbc.com/news/magazine-17105569 (discussing role of Malay, English, and Mandarin languages in contemporary Malaysia). Additional long incarceration beyond such banishment would not be "just punishment." *See* 18 U.S.C. § 3553(a)(2)(A).

Given the harsh consequences of deportation, a sentence for some months of time served while awaiting trial or sentence plus ten days is "sufficient . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a). This holds true with respect to Chong, who appears chastened and remorseful, and with respect to others, who will appreciate the gravity of Chong's punishment. Some of Chong's friends lack United States citizenship, and one friend agreed to testify against Chong (pursuant to a non-prosecution agreement) with the understanding "that [he] can be deported from the United States [only] if [he were] convicted of a crime involving drug distribution." Trial Tr., 288:12–14, Mar. 28, 2014. The harsh example made of Chong will serve as a lesson to a broad community.

Deportation obviates the need to incapacitate defendant for the protection of the American public. While it is conceivable that Chong will continue to send drugs into the United States from Malaysia during the time when he would otherwise be incarcerated, this seems unlikely. And, as explained previously, *see supra* Part III.B.3, there is no need to incapacitate Chong in an *American* prison for purposes of protecting the *Malaysian* public. Malaysia's drug laws are among the harshest in the world. *See* Andrew Novak, *The Future of the Mandatory*

*Death Penalty in Malaysia and Singapore: "Asian Values" and Abolition in Comparative Perspective, with Implications for Indonesia*, 1 Indon. J. Int'l & Comp. L. 303 (2014).

Finally, rehabilitation concerns militate in favor of a short term of incarceration where the defendant will be deported upon completion of a sentence. There is the high possibility that Chong would be denied access to rehabilitative programs were he in BOP custody for a prolonged period of time. *See supra*, Part III.B.4.

Even if Chong were to be treated identically to prisoners with United States citizenship while incarcerated, rehabilitative considerations would argue for a shorter sentence. The unique and manifold challenges the defendant will face in a foreign country upon completion of his sentence supply special grounds for minimizing the destruction effects of incarceration and for accelerating the rehabilitation process outside of prison.

The sentence imposed has not ignored the seriousness of the offense conduct. Chong distributed a controlled substance to his friends and sought to bring much larger quantities into the United States. The Drug Enforcement Agency has determined that methylone has the potential for abuse and has noted that "[t]here are at least three reported deaths in which methylone was ruled as the cause of death . . . and there are many reports in which methylone was implicated . . . in deaths." Drug Enforcement Agency, Final Rule, 78 Fed. Reg. 21818–21825 (Apr. 12, 2013) (to be codified at 21 C.F.R. Part 1308). These facts have been considered in imposing sentence. *See* Tr. H'rg., Sept. 4, 2014; Tr. H'rg., Sept. 19, 2014.

**B. Sentence Disparities**

The statute provides a "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Here, a lower sentence was imposed on this defendant's co-defendant, Harpreet Singh. Singh simply agreed to receive a package from China in exchange for a small cash payment; he cooperated fully with the government from the time of his arrest. Defendant, by contrast, arranged to import a wholesale quantity of drugs from an overseas laboratory with the intent to resell the product at a substantial profit.

As already explained *supra* Part III.C., the apparent disparity does not offend Section 3553 (a)(6). That provision does not prohibit *all* "sentence disparities among defendants with similar records who have been found guilty of similar conduct." Rather, it underscores the need to minimize "*unwarranted*" disparities between such individuals. The harsh consequences defendant Chong (a noncitizen) will suffer are more severe in kind and effect than the penalties imposed on the less culpable Singh (a citizen). And they are more severe in effect than the sentence that would be meted out to a typical non-cooperating defendant with United States citizenship. The disparity between defendant and Singh, and between defendant and a hypothetical similarly-situation citizen defendant, are "warranted."

## VI. Sentencing Guidelines

### A. Base Offense Level

The 500:1 methylone-to-marijuana equivalency for sentencing guidelines purpose relied upon by the government is rejected. Also rejected is the defendants' proposal of a 10:1 ratio. Comprehensive expert testimony and other evidence was received on this issue.

Adopted is the Second Circuit's district court's equivalency of 200:1 effective at the time the crime was committed. *See, e.g. United States v. McCarthy*, No. 09 Cr. 1136, 2011 WL 1991146, at *4 (S.D.N.Y. May 19, 2011) (200:1 MDMA-marijuana equivalency); *United States v. Qayyem*, No. 10. Cr. 19(KMW), 2012 WL 92287, at *8 (S.D.N.Y. Jan. 11, 2012) (same);

Indictment 1, Oct. 7, 2013, ECF No. 10; *Chong*, 991 F. Supp. 2d at 453 (analyzing a case involving methylone); *cf. United States v. Kamper*, 748 F.3d 728 (6th Cir. 2014) (majority opinion) (holding error in court's failure to exercise discretion to reject MDMA-to-marijuana ratio in the *Sentencing Guidelines*; analyzing this and other "designer" drugs). Nothing in the extended technical chemical analysis testified to in hearings or briefings on this issue demonstrated that a different result is required or equitable. *See* Sentencing H'rg Sept. 4, 2014; Sentencing H'rg, Aug. 20, 2014; Trial Tr., Mar. 31–Apr. 2, 2014; Trial Tr., Mar. 27–28, 2014; U.S.' Sentencing Mem., Aug. 15, 2014, ECF No. 153; Def.'s Mot. In Limine to Limit Cross-Exam. of Defense Expert, Aug. 19, 2014, ECF No. 157; Def.'s Sentencing Mem, Aug. 19, 2014, ECF No. 155; Def.'s Sentencing Mem, July 25, 2014, ECF No. 148; Def.'s Sentencing Mem., July 24, 2014, ECF No. 147.

Pursuant to directions from the Court of Appeals for the Second Circuit, a district court will consider on sentencing relevant conduct of which the defendant was acquitted. *See United States v. Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005); *United States v. Shahid*, 486 F. App'x 915, 917 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 564 (U.S. 2012); *but see* Tony Mauro, *Drug Case Sentencing Dispute Pitched to Supreme Court*, Legal Times (Aug. 26, 2014 3:27 PM), http://www.nationallawjournal.com/legaltimes/home/id=1202667734962/Drug-Case-Sentencing-Dispute-Pitched-to-Supreme Court?mcode=1202619041376&curindex=2&slreturn=20140726152700 (law in dispute).

At least two district courts in this circuit have thoroughly considered the problem. Uniformity on this ratio issue in this circuit is desirable. Uniformity and predictability will provide more effective general deterrence. It will also assist in obtaining future plea agreements that require a credible assumption on the sentence to be expected.

The net weight of the methylone recovered from the package mailed to defendant from China was 493.3 grams. The jury found the defendant not guilty of importing this package. But its decision is contrary to the evidence on this point. The verdict appears to have been motivated by concern of the jury for the possible harshness of drug sentencing laws when a defendant was only a minor distributor to friends for social purposes. Under current Second Circuit law the guidelines weight is 493.3 grams, the equivalent of 98,660 grams, or 98.6 kilograms of marijuana.

### B. Calculations

Under U.S.S.G § 2D 1.1(8), at least 80 kilograms of marijuana equivalent but less than 100 kilograms provides an offense level of 24.

The upward adjustment for defendant's role in the offense is plus 2 because he was an organizer and leader in relevant criminal acts: he obtained, supplied and dispensed the drug.

Adjustment for obstruction of justice is plus 2. The defendant attempted to dispose of his incriminating cellular telephone and to dump the pill capsules used to dispense the drug when he faced arrest. *See* U.S.S.G. at § 3C1.1.

The offense level is reduced by 2 points under new sentencing guidelines that become effective November 2014; defendant agreed to forgo a motion under 18 U.S.C. § 3582(c) after the new guidelines come into effect. The adjusted total is 26 and criminal history is category I, yielding a guideline imprisonment range of 63–78 months. A sentence within this range would be excessive given the "nature and circumstances of the offense and the history and characteristics of the defendant", as well as the purposes of sentencing. *See* 18 U.S.C. § 3553(a)(1); *supra* Part V.

The guidelines range for supervised release is three years to life. U.S.S.G. § 5D.1.2(c). The statute requires a supervised release term of at least three years. 21 U.S.C. § 841(b)(1)(C). A three-year term of supervised release suffices since defendant will be abroad where he will do no harm in this country and supervision is impractical.

The defendant has no assets. He is unlikely to have any sufficient assets to pay a fine. No fine is imposed. A special assessment fee of $100 is imposed. 18 U.S.C. § 3013(a)(2)(A).

## VII. Conclusion

The defendant is sentenced to time served, calculated by the United States Probation Department as 177 days, plus 10 days. Ten days will give the Department of Homeland Security Immigration and Customs Enforcement the opportunity to take custody of the defendant, if it deems such action appropriate, and to hold him for deportation.

The court makes no direction or suggestion with respect to defendant's deportation. Any appeal should be expedited to prevent extended incarceration in the custody of the Department of Homeland Security. The process should not be the punishment. *See United States v. Lopez-Aguilar*, CR 93-209, 1996 WL 407300 (E.D.N.Y. July 16, 1996) (presence before the court in the United States required at resentence), *vacated in part sub nom., United States v. Londono*, 100 F.3d 236 (2d Cir. 1996); *cf.* Malcom M. Feeley, *The Process is the Punishment: Handling Cases in a Criminal Court* (1992). Deportation would frustrate such a resentence.

No fine is imposed. Defendant shall serve a three-year term of supervised release under conditions specified orally at sentencing. A $100 special assessment is payable forthwith.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: September 22, 2014
       Brooklyn, New York